**[J-25-2023] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 97 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Chester County Court of Common |
| | : | Pleas, Criminal Division, dated |
| v. | : | August 22, 2022 (filed on August 23, |
| | : | 2022) at No. CP-15-CR-1570-2016 |
| | : | |
| GEORGE J. TORSILIERI, | : | ARGUED:  May 23, 2023 |
| | : | |
| Appellee | : | |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                                    **DECIDED:  May 31, 2024**

I dissent from the Majority's application of the irrebuttable presumption doctrine in this challenge to Pennsylvania's Sexual Offender Registration and Notification Act.[1]  To establish a violation of the irrebuttable presumption doctrine, "the challenging party must demonstrate (1) an interest protected by the due process clause, (2) utilization of a presumption that is not universally true, and (3) the existence of a reasonable alternative means to ascertain the presumed fact."  *Commonwealth v. Torsilieri*, 232 A.3d 567, 579 (2020) (citing *In re J.B.*, 107 A.3d 1 (Pa. 2014) ("*J.B.*")).  Here, the Majority relies entirely on a single statistical fact[2] to refute the trial court's finding that Torsilieri disproved the General Assembly's presumption that sexual offenders "pose a high risk of committing

---

[1]  42 Pa.C.S. §§ 9799.10-9799.42 ("SORNA").

[2]  The Majority relies on an uncontroverted statistic that holds that sexual offenders "reoffend" at a rate of at least three times higher than those convicted of non-sexual offenses.  Majority Op. at 37.  For the sake of brevity and ease of discussion, I will refer to this statistic henceforth as the "aggregate recidivism rate."

additional sexual offenses[.]"[3] The legislative presumption speaks in absolute terms — sexual offenders pose a high risk of committing additional sexual offenses. Thus, the second prong of the test to determine the validity of the presumption asks whether, based on the evidence, sexual offenders pose a high risk of committing additional sexual offenses. As will be discussed, the scientific evidence in this case points consistently and overwhelmingly to the conclusion that the risk of sexual recidivism from an individual sex offender is not high, nor anything close to it.

Instead of analyzing the validity of the legislative presumption that sexual offenders pose a high risk of committing additional sexual offenses, the Majority rephrased the question into one based on relativity: Do sex offenders reoffend at a rate **higher than** those convicted of non-sexual offenses? But this question and its answer does not capture the General Assembly's ostensible point that sex offenders pose a high risk to members of the community in that community members will be targets of sex offenses perpetrated by sex offenders who are subject to SORNA. This is precisely the point that the scientific evidence refutes.

The Majority's analysis of the question before this Court evokes the adage: "Some men use statistics as a drunken man uses lampposts. For support rather than illumination."[4] The Majority upends the irrebuttable presumption doctrine, preserving it in theory while effectively ending its application in practice, and it does so by permitting a marginally interesting statistic to replace the credible testimony of three experts on the invalidity of the challenged presumption. If the Majority seeks to kill the irrebuttable presumption doctrine's continued applicability in Pennsylvania as suggested by the

---

[3] 42 Pa.C.S. § 9799.11(a)(4) (hereinafter "SORNA's irrebuttable presumption").

[4] Walter Winchell, Walter Winchell (Syndicated column), Daytona Beach Morning Journal, November 16, 1948, at 2, column 3.

Concurring and Dissenting Opinion,[5] it should do so without the dubious and illogical misuse of statistical evidence.

Also contrary to the Majority's decision today, like Justice Wecht, I would find that the lifetime registration and reporting requirements of Subchapter H of SORNA are punitive and, therefore, violate the constitutional standard set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 489 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

I respectfully dissent.

## Irrebuttable Presumption Doctrine

In *Vlandis v. Kline*, 412 U.S. 441 (1973), the United States Supreme Court recognized the doctrine by name, stating that "[s]tatutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." *Vlandis*, 412 U.S. at 446.[6] In that case, nonresident

---

[5] *See* Concurring & Dissenting Op. at 3-21 (Wecht, J., concurring and dissenting).

[6] The *Vlandis* Court cited numerous cases supporting this proposition going back to 1926, when the High Court determined that an inheritance tax statute violated due process because it utilized a "conclusive presumption that all material gifts within six years of death were made in anticipation of" that death "without regard to the actual intent." *Schlesinger v. State of Wisconsin*, 270 U.S. 230, 239 (1926). Thus, to the extent the Majority's summary suggests that the irrebuttable presumption doctrine was short lived in the federal courts, *see* Majority Op. at 25 (stating the United States Supreme Court applied the doctrine from "the late 1960s to the mid-1970s"), such a representation overlooks or undersells a deeper history.

Indeed, the Commonwealth's overarching concern here for judicial deference to legislative prerogatives echoes Justice Oliver Wendell Holmes, Jr.'s dissent in *Schlesinger*, 270 U.S. at 241 (Holmes, J., dissenting) (stating that "in dealing with state legislation upon matters of substantive law we should avoid with great caution attempts to substitute our judgment for that of the body whose business it is in the first place, with regard to questions of domestic policy that fairly are open to debate"). However, great caution should never require a rubber stamp in defiance of reason. The core function of the irrebuttable presumption doctrine is to provide a rare but essential judicial check on
(continued…)

applicants to the state university system in Connecticut, a status that carried higher tuition and fees than residents, were subject to an irrebuttable presumption that their nonresident status continued for the duration of their time at a Connecticut university. The *Vlandis* Court held that the irrebuttable presumption of nonresident status "is violative of the Due Process Clause, because it provides no opportunity for students who applied from out of State to demonstrate that they have become bona fide Connecticut residents." *Vlandis*, 412 U.S. at 453. The *Vlandis* decision followed application of the same principle in all but name in *Bell v. Burson*, 402 U.S. 535 (1971), and *Stanley v. Illinois*, 405 U.S. 645 (1972).[7]

The irrebuttable presumption doctrine was quickly refined in *Weinberger v. Salfi*, 422 U.S. 749 (1975), a case involving an irrebuttable presumption in the "distribution of social insurance benefits." *Salfi*, 422 U.S. at 785. Distinguishing such programs from the use of irrebuttable presumptions in criminal or custody matters, where the latter involve "affirmative Government action which seriously curtails important liberties[,]" the *Salfi* Court found "no basis for our requiring individualized determinations" in cases involving social welfare programs. *Id*. Later, in *Michael H. v. Gerald D.*, 491 U.S. 110 (1989) (plurality), the High Court signaled doubts about the continued application of the irrebuttable presumption doctrine. Yet this Court has twice applied the irrebuttable presumption doctrine since *Michael H. v. Gerald D.*, and no party before us today has asked this Court to abandon it.

---

the legislative branch when the falsity of an irrebuttable presumption that adversely affects individual rights is not or is no longer "fairly … open to debate." *Id*.

[7]  In *Bell*, the United States Supreme Court held that the state of Georgia could not conclusively presume fault merely because an uninsured motorist was involved in an accident without a hearing to contest that presumption. *Bell*, 402 U.S. at 542-43. A year later, applying similar rationale in *Stanley*, the High Court struck down an Illinois statute that presumed an unmarried father was unfit to be a parent, without providing individual fathers the opportunity to rebut that presumption, in determining custody following the death of a mother.

Seven years after *Michael H. v. Gerald D.*, this Court continued to recognize that "irrebuttable presumptions are violative of due process where the presumption is deemed not universally true and a reasonable alternative means of ascertaining that presumed fact are available." *Bureau of Driver Licensing v. Clayton*, 684 A.2d 1060, 1063 (Pa. 1996). The *Clayton* Court was well-aware of (yet undeterred by) the High Court's warning signs in *Michael H. v. Gerald D.* and forged ahead to apply the doctrine after rejecting the assertion that the various opinions in *Michael H. v. Gerald D.* could be synthesized into a de facto majority holding that "procedural due process analysis alone applies" when reviewing irrebuttable presumption claims. *Clayton*, 684 A.2d at 1063.

More recently, in a case also involving SORNA, this Court held "that the application of SORNA's current lifetime registration requirements upon adjudication of specified offenses violates juvenile offenders' due process rights by utilizing an irrebuttable presumption" where "juvenile offenders have a protected right to reputation encroached by SORNA's presumption of recidivism, where the presumption is not universally true, and where there is a reasonable alternative means for ascertaining the likelihood of recidivating." *J.B.*, 107 A.3d at 19-20. The Majority in this case recounts several federal decisions since *Michael H. v. Gerald D.* that continue to criticize the irrebuttable presumption doctrine but, critically, neither *Bell*, *Stanley*, nor *Vlandis* have been overruled by the United States Supreme Court, and both *Clayton* and *J.B.* remain good law in Pennsylvania. Thus, reports of the death of the irrebuttable presumption doctrine in Pennsylvania are greatly exaggerated, at least until today.[8]

---

[8] The Concurring and Dissenting Opinion suggests that this Court should kill the irrebuttable presumption doctrine sua sponte. Concurring & Dissenting Opinion at 21 (Wecht, J., concurring and dissenting) ("The irrebuttable presumption doctrine is a jurisprudential corpse. For whatever reason, this Court insists on keeping it alive. It's time to bury it."). Despite its colorful mixing of life-and-death metaphors, the Concurring (continued…)

To its credit, the Majority acknowledges the irrebuttable presumption doctrine's continued endurance in Pennsylvania in the thirty-five years since *Michael H. v. Gerald D.*, but its application of the doctrine here guts it of any meaning. Before today, a solitary

and Dissenting Opinion fails to land its intended punchline—that this Court alone supports the "jurisprudential corpse" of the irrebuttable presumption doctrine.

Although the Concurring and Dissenting Opinion struggles to admit as much, the United States Supreme Court did not kill the irrebuttable presumption doctrine in *Salfi*. *Id*. at 16 ("Although the *Salfi* Court **did not** expressly overrule the irrebuttable presumption precedents, that decision severely hampered the applicability of the doctrine, and may well have become its obituary.") (footnote, quotation marks, and brackets omitted) (emphasis added). If it had died in *Salfi*, surely Justice Scalia's plurality would have noted that fact fourteen years later in *Michael H. v. Gerald D.*, in which a divided court sparred around the margins of the irrebuttable presumption doctrine. Although we can debate whether Justice Scalia's plurality opinion in *Michael H. v. Gerald D.* was intended to kill the irrebuttable presumption doctrine, how that opinion is construed is irrelevant. Justice Scalia failed to garner a majority, and none of the justices who decided *Michael H. v. Gerald D.* sit on the United States Supreme Court today. Consequently, whatever predictive value scholars once deduced from the vote distribution *Michael H. v. Gerald D.* is now obsolete. Moreover, our application of the doctrine is well-suited to protect the right to reputation under Pa. CONST. art. I, § 1, which is consistent with the limitation placed on the doctrine in *Salfi*.

The Concurring and Dissenting Opinion lauds abandonment of the doctrine as an act of respect for the legislative authority, but that respect is already baked into the high burden required to make out a successful claim. Thus, I do not advocate to preserve the doctrine for precedent's sake alone. By preserving the doctrine, I believe we preserve a rare but vital check on legislative overreach.

No number of non-precedential opinions and law review articles can bury a constitutional doctrine merely because it has been subject to criticism. For nearly forty years after *Salfi* was decided, and for nearly twenty-five years after the stalemate in *Michael H. v. Gerald D.*, the academic debate over the continued vitality of the irrebuttable presumption doctrine raged before we decided *J.B.*, a 6-1 majority opinion. Notably, the dissent in *J.B.* found no fault in the durability of the irrebuttable presumption doctrine, and only challenged its application under the facts of that case. *See J.B.*, 107 A.3d at 20-21 (Stevens, J., dissenting). That was ten years ago. So, in the five decades since *Salfi*, this Court has not repudiated the irrebuttable presumption doctrine and the United States Supreme Court has still not dispatched it nor overruled any precedent on which it continues to rest. That speaks far more to the doctrine's longevity than to its demise. While I do not rule out that there may be occasions where the abandonment of stale legal doctrines is justified without explicit advocacy to that effect, this is, in my opinion, clearly not one.

statistical fact about a group trait, devoid of the context in which it arises, would not have salvaged an irrebuttable presumption. Indeed, as demonstrated below, similar statistical facts supporting a contested legislative presumption were tacitly presumed in several cases that applied the irrebuttable presumption doctrine. Yet, the Majority decision rests entirely on the aggregate recidivism rate of sex offenders to defeat the assertion that SORNA's irrebuttable presumption is not universally true.

For instance, in *Stanley*, Illinois law provided that "the children of unwed fathers become wards of the State upon the death of the mother." *Stanley*, 405 U.S. at 646. That policy was premised on an irrebuttable presumption that unwed fathers were "presumed unfit to raise their children[,]" and it was deemed "unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents." *Id*. at 647. The United States Supreme Court decided to answer the question: "Is a presumption that distinguishes and burdens all unwed fathers constitutionally repugnant?" *Id.* at 649. After recognizing "Stanley's interest in retaining custody of his children is cognizable and substantial[,]" and that Illinois had a legitimate interest in separating "neglectful parents … from their children[,]" the High Court then considered "whether the means used to achieve these ends are constitutionally defensible." *Id*. at 652. They were not. *Id*. at 658 (holding that "Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody").

In rejecting Illinois's irrebuttable presumption that unwed fathers were unfit parents, the United States Supreme Court noted that "[i]t may be, as the State insists, that **most** unmarried fathers are unsuitable and neglectful parents." *Id*. at 654 (emphasis added). It further observed that "it may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's." *Id*. at 656. Nevertheless, the *Stanley* Court determined that

> the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.
>
> Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.

*Id*. at 656-57 (footnote omitted).

In *Clayton*, the Department of Transportation utilized an irrebuttable presumption that any person suffering an epileptic seizure was incompetent to drive for at least a year and could only regain their license by having a doctor certify that they had been seizure free for at least a year. *Clayton*, 684 A.2d at 1061. That presumption was not arbitrary; it was premised on the fact that a "Medical Advisory Board ha[d] deemed persons who have suffered even one epileptic seizure unsafe to drive," until it could be shown that they had remained seizure free for at least year. *Id.* at 1065. The *Clayton* Court further recognized that "precluding unsafe drivers, **even those who are potentially unsafe drivers**, from driving on our highways is an important interest." *Id*. (emphasis added). Nonetheless, the *Clayton* Court held that "revocation of one's operating privilege for a period of one year upon the occurrence of only a single epileptic seizure, without the licensee having an opportunity to present medical evidence in an effort to establish his or her competency to drive, violates due process." *Id*. at 1061. Although the Commonwealth had a legitimate interest in protecting the public from unsafe driving,

> it is not an interest which outweighs a person's interest in retaining his or her license so as to justify the recall of that license without first affording the licensee the process to which he is due. Indeed, since competency to drive is the

> paramount factor behind the instant regulations, any hearing
> which eliminates consideration of that very factor is violative
> of procedural due process.

*Id.* at 1065.

Thus, the *Clayton* Court was not concerned with statistical evidence that might demonstrate that epileptic seizure sufferers were, collectively, more likely to be unsafe or incompetent drivers in the year following a seizure than other drivers. Rather, the Court found a due process violation from the fact that individuals who had suffered a seizure had no opportunity to contest a presumption about their competency to drive—a presumption based on a rational and legitimate concern for an elevated group risk to public safety on Pennsylvania roadways presented by those who suffer from seizures.[9] It is also notable that the *Clayton* Court was unconcerned that the presumption was only irrebuttable for one year following a seizure, and that due process was provided to the extent that it permitted an individual to contest whether they had suffered a seizure.[10]

In *J.B.*, this Court considered the same protected interest at stake in this case, the "right to reputation under the Pennsylvania Constitution." *J.B.*, 107 A.3d at 16. Likewise, we considered exactly the same irrebuttable presumption, that being SORNA's declaration "that sexual offenders, including juvenile offenders, 'pose a high risk of

---

[9] Justice Zappala misunderstood this distinction when he mistakenly reframed Clayton's argument as a pure equal protection claim: that Clayton was "treated differently from other drivers (is being denied equal protection) because of the occurrence of an epileptic seizure." *Clayton*, 684 A.2d at 1066 (Zappala, J., dissenting). To the contrary, the due process violation did not occur because Clayton was being treated differently as a member of group who had epileptic seizures from those who had not suffered epileptic seizures. The due process violation resulted from the denial of Clayton's individual right to a forum to contest the presumption that he presented the same or similar risk as the group in which he was categorized.

[10] "[G]iven the nature of the matter currently before the courts, it cannot be gainsaid that any 'meaningful' opportunity to be heard would here require that the licensee be permitted to present objections, not to the conclusion that he had suffered an epileptic seizure, but rather to the presumption of incompetency to drive." *Clayton*, 684 A.2d at 1065.

committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest.' 42 Pa.C.S. § 9799.11(a)(4)." *Id.* We further recognized that, "even without this language, the common view of registered sexual offenders is that they are particularly dangerous and more likely to reoffend than other criminals." *Id.* In *J.B.*, however, we were concerned with a large subset class of sexual offenders, juveniles, rather than an individual sexual offender. Thus, in addressing the second irrebuttable presumption doctrine factor in *J.B.*—utilization of a presumption that is not universally true—we narrowed the universe governed by the irrebuttable presumption to encompass only juvenile offenders, despite the fact that SORNA's irrebuttable presumption only speaks to sex offenders generally. The *J.B.* Court agreed with the trial court's holding that SORNA's irrebuttable presumption "that sexual offenders pose a high risk of recidivating is not universally true when applied to juvenile offenders." *Id*. at 17. This was because, as a class, "juvenile sexual offenders exhibit low levels of recidivism (between 2–7%), which are indistinguishable from the recidivism rates for non-sexual juvenile offenders, who are not subject to SORNA registration." *Id*. Moreover, the *J.B.* Court identified several ways in which juvenile sexual offenders were categorically different from adult sexual offenders, adopting the United States Supreme Court recognition of such differences in a line of cases that curtailed application of the most extreme criminal punishments imposed on juvenile offenders. *Id.* at 18-19.[11]

### *Torsilieri I*

When this case was first before us, the Majority recognized that, in *J.B.*, we had "concluded that the scientific consensus relating to adolescent development, as

---

[11] *See Miller v. Alabama*, 567 U.S. 460 (2012) (declaring mandatory life without parole unconstitutional for any offense committed by juveniles); *Graham v. Florida*, 560 U.S. 48 (2010) (declaring life without parole unconstitutional for non-homicide crimes committed by juveniles); *Roper v. Simmons*, 543 U.S. 551 (2005) (declaring capital punishment unconstitutional for any offense committed by juveniles).

recognized through the United States Supreme Court's jurisprudence, refuted the legislative presumption that all juvenile offenders were at high risk of recidivation." *Commonwealth v. Torsilieri*, 232 A.3d 567, 584 (Pa. 2020) ("*Torsilieri I*"). *J.B.* showed that "a viable challenge to legislative findings and related policy determinations can be established by demonstrating a consensus of scientific evidence where the underlying legislative policy infringes constitutional rights." *Id.* Thus, we rejected the Commonwealth's "categorical contention that the trial court lacked the authority to consider [Torsilieri]'s scientific evidence and to question the validity of the General Assembly's findings and policy determinations." *Id.* Furthermore, we observed that, based on "the evidence relied upon by the trial court," Torsilieri presented "colorable constitutional challenges" to, inter alia, SORNA's irrebuttable presumption. *Id.*

Regarding the second irrebuttable presumption factor concerning universality, the trial court had found that SORNA's irrebuttable presumption was not universally true after Torsilieri demonstrated

> that the research indicated that eighty to ninety percent of all sexual offenders are never reconvicted for a sexual crime. Moreover, the trial court opined that [*Torsilieri*] fell into a subgroup of offenders without criminal backgrounds, significant life problems, or the prognosis typical of offenders. The research reviewed by the trial court revealed that this subgroup has even lower recidivism rates.

*Id*. at 586.

Despite having the opportunity to do so, the Commonwealth simply refused to offer any evidence to the contrary. Nonetheless, over this author's dissent, this Court afforded the Commonwealth a second bite at the apple, reasoning:

> A review of the court's conclusions clearly reveals that the court's analysis of each of the three prongs of the irrebuttable presumption doctrine relies heavily upon the scientific evidence presented by [Torsilieri]. As noted, the Commonwealth parties awaited this appeal to proffer evidence to rebut [Torsilieri]'s experts. Given the procedures

leading to this point, the importance of the underlying issue, and our deference to legislative policy determinations, we decline to render a conclusion on the basis of the record before us. Instead, we conclude that remand is necessary to allow the parties to present additional argument and evidence to address whether a scientific consensus has developed to overturn [SORNA's irrebuttable presumption].

*Id.* at 587. Apart from this vague appeal to the importance of this case, the Majority offered no obvious legal justification to remand for additional factfinding. As I noted at the time, the Commonwealth failed to offer anything to counter Torsilieri's scientific evidence "[d]espite having months to prepare for an evidentiary hearing on that point[.]" *Id.* at 596 (Donohue, J., dissenting).

On appeal from the trial court's ruling, however, the Commonwealth presented evidence it had not proffered in the trial court that sex offender recidivism was not the proper metric for our legal analysis. *Id.* at 597. The Commonwealth shifted "to a different argument to justify [SORNA's irrebuttable presumption], that sex crimes are underreported and therefore the true recidivism rate is unknown." *Id.* Writing in dissent, I found no reason for a remand to permit the Commonwealth to substantiate those claims, and "that due process precludes the General Assembly from presuming that **all persons** convicted of one of the approximately thirty crimes mandating registration **pose a high risk** of committing additional sexual offenses." *Id.* at 597 (emphasis added).

I further acknowledged that in considering whether a "presumption is universally true, we have not applied this requirement literally; the existence of even one exception to the presumed fact would definitionally establish a lack of universality." *Id.* at 604. In this context, that would mean that the existence of a single sex offender who never recidivated would definitionally prove the universal presumption invalid. I continue to believe now that such an impossible standard is simply unworkable and would hamstring the legislature in addressing sexual recidivism. As I stated then, "the General Assembly

must be given some leeway in this arena given the public interest involved in protecting the community from sexual offenders." *Id*. at 605.

However, I further opined that "the time has come for this Court to recognize that a consensus will never exist on the question of whether sexual offenders pose a danger of recidivism **because different types of offenders pose different types of risks**." *Id*. at 605-06 (emphasis added). It is precisely because risk across the class of sexual offenders is not remotely uniform that I rejected "a legal conclusion that the General Assembly can simply treat all offenders as if they are highly likely to recidivate despite evidence to the contrary." *Id*. at 606.

In specifically addressing the issue of the Commonwealth's "shift[ing] the goalposts" from recidivism rates of sexual offenders to the unknown number of unreported sexual crimes, I remarked, "the relevant question should not be whether convicted sexual offenders are committing unreported sexual crimes, but rather whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws." *Id*. at 606. This statement was presented in the context of my view that the reality of unreported offenses "cuts both ways" because "the specter of underreported crimes means that offenders convicted of non-sexual offenses also pose a threat of committing sexual offenses." *Id*. Additionally, although Torsilieri proffered ample evidence to contest SORNA's irrebuttable presumption, I observed (among other shortcomings) that the Commonwealth failed "to establish that the population of offenders who are convicted of sexual crimes requiring registration are any more likely to recidivate than any other population of offenders." *Id*. Although this observation of the type of evidence the Commonwealth could have but failed to produce during the first post-sentence motion hearing was one of many failings discussed, it now defines the low burden set by the

Majority today for what constitutes a scientific consensus that refutes SORNA's irrebuttable presumption.

### *Torsilieri II*

On remand, the trial court received testimony from Torsilieri's three experts, Dr. Karl Hanson, Dr. Elizabeth Letourneau, and Professor James Prescott.[12] The Commonwealth presented only one witness, Dr. Richard McCleary. Dr. Karl Hanson and Dr. Letourneau provided copious testimony on sex offender recidivism research that was pertinent to whether SORNA's irrebuttable presumption was universally true.[13] As a baseline, Dr. Letourneau's testimony established that approximately "95% of all sexual offenses are committed by first-time offenders[,] not recidivists." Trial Court Opinion, 8/23/22, at 6. Dr. Hanson and Dr. Letourneau agreed that research shows that **at least** 80% of sex offenders "will not reoffend sexually."[14] *Id*. Based on this evidence, the trial court determined that SORNA's irrebuttable presumption was not universally true. *Id*.

In reaching that conclusion, the trial court considered but ultimately rejected Dr. McCleary's testimony. Dr. McCleary "opined that all research yielding an outcome different from the Commonwealth's position was fatally … flawed" methodologically "and unreliable." *Id*. at 7. The trial court determined that Dr. McCleary's "blanket denunciation

---

[12] Prior to remand, the Commonwealth had stipulated to the content but not the credibility of their affidavits.

[13] Dr. LeTourneau's and Professor Prescott's combined testimony on direct and cross examination on June 28, 2021, filled approximately 283 pages of transcripts. Dr. Hanson's testimony on direct and cross examination on June 29, 2021, alone filled approximately 196 pages of transcripts. Thus, although stated succinctly below, the testimony regarding sex offender recidivism research that was relied upon by the trial court was voluminous and subjected to rigorous examination by the parties.

[14] Dr. Hanson stated that studies show that 80% to 85% of sex offenders will not recidivate sexually, whereas Dr. Letourneau stated that her review of the research shows a range of 80% to 95%. Trial Court Opinion, 8/23/22, at 6. Thus, they agree that at least four out of five sex offenders will not recidivate sexually.

of all research contrary to the Commonwealth's position … materially detract[ed] from his credibility[,]" in contrast to Torsilieri's experts who had explained at length the research that demonstrated that sex offenders do not universally exhibit high recidivism, and who are themselves "well-respected experts in the field[.]" *Id.* Furthermore, the trial court found that Dr. McCleary's "criticism of the science opposing the Commonwealth's position can be applied with equal fervor to the studies cited by the Commonwealth in support of its position." *Id.*

The trial court also specifically considered the Commonwealth's citation of the so-called "dark figure" of sexual recidivism,[15] which suggests (based on a single research paper) that because many sexual offenses go unreported, the recidivism rates cited by Torsilieri's experts—rates that had been confirmed over numerous studies over several decades—have been cast into doubt. *Id.* at 8. The trial court accepted Dr. Hanson's explanation that, although the implication of that single study might suggest that sex offender recidivism rates are high, that conclusion is not generally accepted in the scientific community. *Id.* at 8-10.[16] Moreover, for comparative purposes, the trial court observed that all categories of crimes have a dark figure, and that there is "no hard data demonstrating the rate of unreported sexual offenses is significantly higher than that regarding unreported crimes in general." Trial Court Opinion, 8/23/22, at 10.

---

[15] "Dark figure" is a euphemism for the unknown number of unreported or undiscovered crimes generally; this concept is also sometimes identified as "latent criminality." Here, the term "dark figure" is specifically referring to a 2019 study called "The Dark Figure of Sexual Recidivism." *See* Nicholas Scurich & Richard S. John, THE DARK FIGURE OF SEXUAL RECIDIVISM, UC Irvine School of Law Research Paper No. 2019-09 (Feb. 4, 2019).

[16] One of the more striking criticisms of that study offered by Dr. Hanson was that the statistical model used did not even allow for a category of sex offenders who did not recidivate sexually—i.e., the statistical model itself assumed that all sex offenders would periodically recidivate sexually. N.T., 6/28/2021, at 98. The model also assumed "recidivism risk is a constant that does not change over time[,]" an assumption "not supported by the data." *Id.*

"The bottom line," the trial court found, "is that 80% to 95% of all sex offenders" will not recidivate sexually. *Id*. Thus, the trial court concluded that "SORNA's irrebuttable presumption that all sex offenders pose a high risk of sexual recidivism is not universally true." *Id*.

### Majority Opinion

The Majority correctly observes that, when addressing the second irrebuttable presumption prong, it is simply impractical to expect that the at-issue presumption is universally "true throughout a class, without exception." Majority Op. at 34. Thus, in setting the burden to demonstrate that an irrebuttable presumption is not universally true, this Court has spurned a literal focus on whether exceptions to the presumption exist, and instead refined the test to a consideration of whether there is a scientific consensus that rebuts the presumption. *Id*. at 35. Here, that means whether there exists "a consensus of scientific evidence rebutting the presumption as to the class of adult sex offenders (that they are at high risk of reoffending)." *Id*. To this point, I fully agree with the Majority. However, the Majority's analysis quickly goes awry.

The Majority then explains that *Torsilieri I* "was specific and clear regarding the relevant question to be answered on remand." *Id*. That question, the Majority now proclaims, is "whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws." *Id*. The Majority believes *Torsilieri I* was specific and clear, citing a sliver of my dissent in *Torsilieri I* and footnote 22 of the Majority Opinion in *Torsilieri I*.[17] After narrowly framing the question in this manner, the Majority quickly disposes of Torsilieri's irrebuttable presumption claim because his "own experts concede

---

[17] "We generally agree with the Dissent's analysis that 'the relevant question should not be whether convicted sexual offenders are committing unreported sexual crimes, but rather whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws.' Dissenting Op. at 606 (Donohue, J., dissenting)." *Torsilieri I*, 232 A.3d at 594.

that adult sexual offenders reoffend at a rate of at least three times higher than other individuals convicted of non-sexual offenses." *Id*. at 37.

Addressing the second issue before this Court, the Majority then tackles whether the trial court erred in holding that that "the registration and notification requirements of Subchapter H are punitive." *Id*. Applying the well-established test for punitiveness established in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ("*Mendoza-Martinez*"),[18] *id*. at 42-55, the Majority then concludes that a balancing of the *Mendoza-Martinez* factors does "not compel the conclusion that Subchapter H is punitive." Majority Op. at 54.

## Analysis

### Irrebuttable Presumption

To begin, I disagree with the Majority that *Torsilieri I* was "specific and clear" that the sole question for remand was to be "whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws." Majority Op. at 35. That language was not found in this Court's mandate, which was much broader:

> As is apparent from the trial court findings, the evidence presented by [Torsilieri] provides a colorable argument to debunk the settled view of sexual offender recidivation rates and the effectiveness of tier-based sexual offender registration systems underlying the General Assembly's

---

[18] In *Torsilieri I*, we succinctly summarized the *Mendoza-Martinez* factors as follows:

> (1) Whether the sanction involves an affirmative disability or restraint; (2) Whether it has historically been regarded as a punishment; (3) Whether it comes into play only on a finding of scienter; (4) Whether its operation will promote the traditional aims of punishment - retribution and deterrence; (5) Whether the behavior to which it applies is already a crime; (6) Whether an alternative purpose to which it may rationally be connected is assignable for it; [and] (7) Whether it appears excessive in relation to the alternative purpose assigned."

*Torsilieri I*, 232 A.3d at 588-89.

findings as well as various decisions of this Court and the United States Supreme Court. Nevertheless, as the trial court did not have the benefit of the opposing science, if any, the evidence currently in the record does not provide a sufficient basis to overturn the legislative determination. Accordingly, we conclude that the proper remedy is to remand to the trial court to provide both parties an opportunity to develop arguments and present additional evidence and to allow the trial court to weigh that evidence in determining whether [Torsilieri] has refuted the relevant legislative findings supporting the challenged registration and notification provisions of Revised Subchapter H.

Accordingly, we vacate that portion of the trial court's order declaring the registration requirements of Revised Subchapter H of SORNA unconstitutional and remand for further proceedings in accordance with this opinion.

*Torsilieri I*, 232 A.3d at 596.

The narrower question cited by the Majority today does not appear in that passage. Rather, it is buried in footnote 22, hardly the appropriate place to issue a "specific and clear" mandate to the lower court. It is further obscured because footnote 22 in *Torsilieri I* addressed my criticism that the Majority had effectively excused the Commonwealth's strategic choice to refuse to proffer any evidence and rejected my determination to address the irrebuttable presumption on that record. *Id*. at 594 n.22. Nonetheless, footnote 22 ended with the Majority deeming "it prudent to remand for further hearing to allow the parties to proffer evidence and argument regarding whether [Torsilieri]'s scientific evidence sufficiently undermines the fact-finding foundation of the legislative policy determinations[,]" again presenting the pertinent question on remand with far less specificity and much more breadth than is suggested by the Majority today. *Id*.

Having retroactively reframed the inquiry below, the Majority's entire analysis of the irrebuttable presumption question before us hinges upon its citation of that aggregate recidivism rate. Majority Opinion at 37 (stating Torsilieri's "own experts concede that **adult** sexual offenders reoffend at a rate of at least three times higher than other

**individuals** convicted of non-sexual offenses…. We need go no further") (emphasis added).[19] But, the record in this case, and the underlying study from which this ostensibly damning statistic derives, clearly show that the Majority's conclusion—that the experts' concession of the aggregate recidivism rate single-handedly defeats Torsilieri's irrebuttable presumption claim—is unfounded.

First, the Majority cannot rely on the Commonwealth's expert, Dr. McCleary, as his testimony as found by the trial court was not credible, and the substance of his testimony was a broad attack on the usefulness of any recidivism statistics, which necessarily includes the aggregate recidivism rate now relied upon by the Majority.[20] Instead, to find this critical evidence, the Majority relies upon the fact that the aggregate recidivism rate is not in dispute, citing several instances when its validity was conceded during the

---

[19] The Majority does not cite the aggregate recidivism rate in the same manner that it was put to Torsilieri's experts, and the Commonwealth was not even consistent in its questions regarding that statistic. Torsilieri's experts were never asked about **adult** offenders at all. The statistics conceded by Torsilieri's experts concerned a comparison between the entire class of sexual offenders (necessarily including juveniles) and the entire class of non-sex offenders. *See* N.T., 6/28/2021, at 203 (asking Dr. Hanson if he agreed "that sexual offenders are three times as likely as non[-]sex offenders to be arrested for rape or sexual assault?"; N.T., 6/29/2021, at 83 (asking Dr. LeTourneau if "Dr. Hanson testified yesterday that sex offenders are three to four times more likely than any other criminal to commit a sex crime, would you agree with that?"); N.T., 6/28/2021, at 274 (asking Professor Prescott if "Dr. Hanson testified that sex offenders are three to four times more likely to commit sex crime than other offenders, would you agree with that?"). Strangely, the questions put to Dr. LeTourneau and Professor Prescott do not entirely align with the question put to Dr. Hanson. Yet, these are the "gotcha moments" upon which the entirety of the Majority's irrebuttable presumption analysis rests.

[20] The Commonwealth summarizes Dr. McCleary's testimony as being that "the empirical literature does not support a reasonable estimate of recidivism rates of registered sex offenders" and that sex offenders "recidivate at different rates and recidivism data is difficult to measure." Commonwealth's Brief at 17. The Commonwealth further summarized Dr. McCleary's testimony as showing that "any fair reading of the literature shows that recidivism rates vary widely" within the population of sexual offenders based on several variables. *Id.* at 18. The record supports the Commonwealth's summary of Dr. McCleary's testimony in this regard.

Commonwealth's cross-examination of Torsilieri's experts. Majority Opinion at 37. The Commonwealth repeatedly asked those experts about a 2019 study published by the Federal Bureau of Justice Statistics.[21] The experts were aware of the study and conceded the aggregate recidivism rate. Torsilieri also concedes the validity of the statistic before this Court. Torsilieri's Brief at 13. Thus, the Majority is correct that the record establishes that the aggregate recidivism rate is true.

However, the irrebuttable presumption doctrine asks not whether the presumption associated with a classification is **generally** true compared to some other group, but whether the presumption is **universally** true. Under the irrebuttable presumption test applicable here, we are concerned with the right to reputation of an individual, not the reputation of the group. Even relaxing the universality metric to proof of a consensus that the irrebuttable presumption is rejected in the scientific community, the validity of the aggregate recidivism rate does not, as the Commonwealth argues and the Majority accepts, demonstrate a lack of consensus on the critical issue of whether sex offenders "pose a high risk of committing additional sexual offenses[.]" 42 Pa.C.S. § 9799.11(a)(4). By reframing the issue into one that is based on relativity, the Majority ignores that SORNA's irrebuttable presumption states an absolute: that sexual offenders "pose a **high risk** of committing additional sexual offenses[.]" *Id.* (emphasis added). The scientific consensus is that sex offenders do not pose such a risk, a fact unaltered by the aggregate recidivism rate.

There are two reasons why this is the case. First, the aggregate recidivism rate does not even answer the question of whether the risk from an individual sex offender to

---

[21] *See* Mariel Alper & Matthew R. Durose, U.S. DEP'T OF JUSTICE, RECIDIVISM OF SEX OFFENDERS RELEASED FROM STATE PRISON: A 9-YEAR FOLLOW-UP (2005-2014) (May 2019). https://bjs.ojp.gov/content/pub/pdf/rsorsp9yfu0514.pdf ("Justice Department Recidivism Study").

recidivate is high. In this regard, the Majority conflates "higher" with "high."[22] Likewise, a higher relative risk of sexual recidivism between two groups cannot stand in for what constitutes a high risk from an individual without more information.[23] A **high** risk of sexual recidivism means far more than a **higher** risk of sexual recidivism than non-sexual offenders. It means there is a high risk to members of the community that they will be the targets of sexual offenses from sex offenders who are subject to SORNA. But that is precisely what the scientific consensus refutes.

Second, the aggregate recidivism rate does not tell us anything about individuals, it tells us only about the group, and it is now beyond doubt that those persons who are subject to SORNA are not homogeneous in terms of individuals' risk of reoffense. To the contrary, as I suggested might be the case in my dissent in *Torsilieri I*, a small subset of sex offenders accounts for a shockingly disproportionate amount of sex offender recidivism that is reflected in the aggregate recidivism rate.

Torsilieri's credible experts clearly demonstrated a scientific consensus that refutes SORNA's irrebuttable presumption, and, in doing so, explained why the aggregate

---

[22] It may be the case that my risk of being killed by a cow is substantially higher than my risk of being killed by a shark, but so what? Neither risk is fairly construed by any stretch of the imagination, as high. *See* SNOPES, *Are More People Killed by Cows than Sharks?*, https://www.snopes.com/fact-check/cows-kill-more-people-than-sharks/ (last visited Apr. 5, 2024) (showing that approximately 5 deaths nationally from shark attacks in 2022, whereas the average rate of national deaths from cows in a comparable time period was 22). Thus, my risk of death by cow as a resident of the United States may be more than four times greater than my risk of death by shark. This is analogous to the aggregate recidivism rate. It is absurd to conclude from those statistics that the risk of death by cow is high merely because it is higher than my risk of death by shark. To the contrary, the risk is extremely low for either threat by any objective measure.

[23] For instance, if the risk of reoffense was uniform or nearly uniform across the class of sexual offenders, then the aggregate recidivism rate would speak far more to the risk of reoffense presented by an individual like Torsilieri. As discussed below, because the risk of reoffense is so heavily skewed by a small subset of sexual offenders, the aggregate recidivism rate is not a good indicator of individual risk.

recidivism rate does not seriously challenge that consensus. Dr. Letourneau credibly testified that it is a "myth that all sex offenders represent a high risk of recidivism and that they are impervious to change." N.T., 6/29/2021, at 34. She acknowledged there are "high risk offenders who remain high risk and who will go on to reoffend," but she emphasized that "the **majority** of people with sex crimes convictions will not go on to reoffend sexually." *Id*. (emphasis added).

How big is that majority? Dr. Letourneau testified that "rigorous research studies find 80 to 95 percent of adult male sex offenders are never reconvicted of a sex crime." *Id*. at 55. This fact was consistent across multiple studies at both the state and national level, including studies from the Justice Department Recidivism Study from which the aggregate recidivism statistic originates. *Id*. The aggregate recidivism rate simply does not speak to the real risk of reoffense presented by an individual sex offender like Torsilieri. The aggregate recidivism rate was calculated by comparing the sexual recidivism rate of non-sex offenders to the sexual recidivism rate of sex offenders.[24] As

---

[24] The Justice Department Recidivism Study compared the likelihood that persons convicted for rape or sexual assault would be arrested for rape or sexual assault in the nine years following their release (7.7%) to the likelihood that a person convicted of any offense would be arrested for rape or sexual assault (2.3%) in the nine years following their release. Justice Department Recidivism Study at 5. Thus, consistent with how the aggregate recidivism rate was expressed by the experts, the sexual offender group was about 3.35 times more likely to be **rearrested** for a sexual offense, although the Majority construes this as a "reoffense" rate. *See* Majority Op. at 37. But, the Justice Department Recidivism Study also states that because "not all arrests result in a conviction or reimprisonment, recidivism rates based on these measures are lower than those based on an arrest." Justice Department Recidivism Study at 3. Thus, if anything, the Justice Department Recidivism Study overstates recidivism if recidivism is understood to be based on new convictions rather than new arrests for sexual offenses.

Notably, no distinction is made in the Justice Department Recidivism Study between adult and juvenile offenders for those calculations. In *J.B.*, this Court compared multiple studies that collectively suggested an aggregate recidivism rate range of 2-7% for juvenile sexual offenders, the top end of which is not significantly different from the Justice Department Recidivism Study's sexual rearrest rate for all offenders. *See J.B.,* 107 A.3d at 17. (continued…)

Dr. Letourneau explained, this is not a surprising result nor is it exceptional with respect to sex offenders, as "we always expect to see—in a large group of data[—]offending at the same type at a higher rate than offending at a different type." *Id*. at 132. The aggregate recidivism rate, however, "did not discuss anything about risk[,]" because it combined "the majority of lower risk offenders" with "the small percentage of the highest risk and you're putting them all together." *Id*. at 132.

As Dr. Letourneau clarified, the "failure to discriminate between the small group of people who may be at higher risk to reoffend sexually from the majority who are at low risk to reoffend sexually … leads to a failure of the SORNA laws to protect the community." *Id*. at 59. Additionally, Dr. Letourneau stated that "about 95 percent of all sex crimes are committed by people who are not previously known to the law for sex offending," implying that one is about twenty times more likely to be the victim of a sexual offense from a first-time offender than from a repeat offender. *Id*. at 50.

Professor James Prescott's testimony dovetailed with Dr. Letourneau's. He rejected SORNA's irrebuttable presumption, stating that "the consensus about sexual recidivism in particular is that it's fairly low relative to criminal recidivism as it's generally viewed. …[T]here are lots of categories of crime where recidivism is quite high. Sex offending is not one of them." *Id*. at 178-79. Indeed, it is so low that Professor Prescott observed that "the only other crime that has a lower recidivism rate is homicide." *Id*. at 179.

---

Although these studies involve different populations over different time periods, nothing about these numbers suggests a high rate of sexual recidivism for adult sexual offenders. The Justice Department Recidivism Study suggests that less than 8 in 100 of those convicted of rape and sexual assault will be rearrested for a similar offense in the nine years following their release. That means that at least 92 of 100 will not be rearrested for similar offenses.

The scientific evidence points consistently and overwhelmingly to the conclusion that the risk of sexual recidivism from an individual sexual offender is not high, nor anything close to it. Using the statistic most favorable to the Commonwealth, four out of five of sexual offenders will never recidivate sexually.[25] Thus, SORNA's irrebuttable presumption does not present a close case where an irrebuttable presumption falls just short of universality. Sexual offenders do not recidivate sexually 99% of the time, or even 90% of the time. They recidivate sexually no more than 20% of the time. That is to say, the vast majority—at least 80%—will never recidivate sexually. On these facts, Torsilieri easily proved that a scientific consensus exists that refutes SORNA's irrebuttable presumption. The Majority's reliance on the aggregate recidivism rate to deny this reality is illogical and unsupported by the record before this Court.[26]

Although not reached by the Majority, the third element of the irrebuttable presumption doctrine asks whether a reasonable alternative exists to ascertain the presumed fact.[27] Given that the recidivism risk of individuals subject to SORNA is so varied, the third element essentially asks whether alternative means exist to SORNA's three-tiered system to distinguish between the small subset of high-risk offenders and the comparatively large subset of low-risk offenders who are needlessly subject to up to a lifetime of onerous registration and reporting requirements. Here, the trial court found

---

[25] Torsilieri's experts testified that studies consistently show that 80-95% of sex offenders will not recidivate sexually. *See supra* n.14.

[26] "Appellate courts are limited to determining 'whether there is evidence in the record to justify the trial court's findings.'" *Commonwealth v. Cosby*, 252 A.3d 1092, 1129 (Pa. 2021) (quoting *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1199 n.6 (Pa. 2001)). When evidentiary support for factual findings can be discerned from the record, we are bound by them. *Id.*

[27] There is no debate in this case that the first element was satisfied because the presumption of a high rate of recidivism "impact's one's right to reputation." *See* Majority Op. at 33 n.13 (citing *J.B.*, 107 A.3d at 16).

that "it is beyond peradventure that the answer is in the affirmative." Trial Court Opinion, 8/23/22, at 6.

As I indicated in my dissent in *Torsilieri I*, because "there is an alternative means to ascertain whether a particular offender is likely to reoffend, a conviction alone cannot support the infringement" of their constitutional right to reputation. *Torsilieri I*, 232 A.3d at 606 (Donohue, J., dissenting). In *J.B.*, this Court recognized that such an alternative is "already in use in Pennsylvania under SORNA" in the form of the Sexually Violent Predator ("SVP") assessment process conducted by the Sexual Offender Assessment Board ("SOAB").[28] *J.B.*, 107 A.3d at 19. "As in *J.B.*, I would hold that the individualized SVP assessment procedure can be expanded to include consideration of the likelihood of re-offense." *Torsilieri*, 232 A.3d at 606 (Donohue, J., dissenting). The Commonwealth already knows how to conduct individualized assessments of risk in an SVP assessment

---

[28] All persons convicted of certain Tier I, Tier II, or Tier III offenses under 42 Pa.C.S. § 9799.14 (as limited by the SVP definition set forth in Section 9799.12), are subject to an SVP assessment by SOAB. 42 Pa.C.S. § 9799.24(a). That assessment includes consideration of a multitude of factors that go beyond the mere commission of an enumerated offense. *See* 42 Pa.C.S. § 9799.24(b)(1)-(4). After SOAB submits its report, the sentencing court conducts a hearing to determine "whether the Commonwealth has proved by clear and convincing evidence that the individual is" an SVP, that is, whether the person possesses "a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses." 42 Pa.C.S. §§ 9799.24(e)(3); 9799.12.

process crafted by the legislature.[29]  Thus, Torsilieri also satisfied the third prong of the irrebuttable presumption test.[30]

In sum, I would hold that the trial court did not err in finding that Torsilieri met his burden to demonstrate that SORNA's irrebuttable presumption is unconstitutional.

<u>Punitiveness under *Mendoza-Martinez*</u>

I join Justice Wecht's analysis in which he balances the *Mendoza-Martinez* factors to conclude that "Subchapter H is punitive in effect."  *See* Concurring & Dissenting Opinion at 21-43 (Wecht, J., concurring and dissenting).[31]  Specifically, I agree that Subchapter H imposes affirmative disabilities or restraints upon sex offenders (factor 1), resembles historical forms of punishment (factor 2), promotes both punitive goals of deterrence and retribution (factor 4); and is excessive in relation to its purpose (factor 7).[32]  *Id*. at 43.  Consequently, because Subchapter H imposes a mandatory punishment for lifetime SORNA registrants in excess of the statutory maximum criminal penalty, it is unconstitutional under *Apprendi*, 530 U.S. at 489 ("Other than the fact of a prior

---

[29]  In addition to relying on this Court's identification of a superior alternative in *J.B.*, the trial court also credited Torsilieri's experts' testimony that "several risk assessment tools, including Dr. Hanson's Static-99 and Static-99R," have been "developed over the last few decades to identify individuals who have a greater likelihood of reoffending sexually than the general population of sex offenders and do so with greater accuracy than the Tier system promulgated under SORNA[.]" Trial Court Opinion, 8/23/2022 at 11-12.  However, while it may be good policy to adopt those alternatives, to satisfy the third prong of the irrebuttable presumption test it is enough to know that the Commonwealth already employs a superior alternative that would better serve to protect individuals' constitutional rights to reputation.

[30]  The Majority signaled that *J.B.* controls and would resolve the third prong in Torsilieri's favor, but that is dicta as the Majority does not reach the third prong under its analysis.  *See* Majority Op. at 33 n.13.

[31]  As explained above, I do not join the first part of Justice Wecht's opinion in which he would dispose of the irrebuttable presumption doctrine sua sponte.  *See* supra note 7.

[32]  The Majority in *Torsilieri I* determined that the third and fifth *Mendoza-Martinez* factors have little relevance here.  I have no dispute with that determination.

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

I expand on Justice Wecht's criticisms of the Majority's rationale in one respect regarding the first *Mendoza-Martinez* factor. As Justice Wecht correctly observes, in *Muniz*, the plurality opinion deemed significant, for purposes of whether SORNA imposed a direct restraint on registrants, that a Tier III offender "would have to make at least one hundred in-person appearances" over a twenty-five-year period, "constituting a significant restraint upon a person's life." Concurring & Dissenting Opinion at 31 (citing *Commonwealth v. Muniz*, 164 A.3d 1189, 1210 (Pa. 2017)). Justice Wecht also appropriately expresses exasperation over the Majority's determination that thirty-four such visits over the same period does not constitute an affirmative disability or restraint without any guidance as to where, exactly, that line from punitive to non-punitive was crossed. *Id*. at 31-32 (citing Majority Op. at 45). The lack of analysis justifying that transition is perplexing and leaves the impression that it is arbitrary.

However, I add that the calculation of thirty-four in-person visits over twenty-five years is merely hypothetical, representing only the bare minimum number of in-person visits that Torsilieri or other Tier III offenders face. The Majority arrived at its calculation of thirty-four in-person visits by assuming that the actual requirement of one-hundred visits over twenty-five years (the quarterly in-person requirement)[33] will be reduced by sixty-six visits by operation of 42 Pa.C.S. § 9799.25(a.1)(1). That provision permits individuals who have been

> in compliance with the requirements of this subchapter for the
> first three years of the individual's period of registration and,

---

[33] As a Tier III offender, Torsilieri is subject to lifetime registration. 42 Pa.C.S. § 9799.15(a)(3). Consequently, he must report in person on a quarterly basis. 42 Pa.C.S. § 9799.25(a)(3). Thus, over twenty-five years, Torsilieri must report in person one-hundred times.

> during the same three-year period, the individual has not been convicted in this Commonwealth or any other jurisdiction or foreign country of an offense punishable by imprisonment of more than one year, the individual shall appear at an approved registration site annually.

42 Pa.C.S. § 9799.25 (a.1)(1).

Why the Majority assumes for purposes of calculating the total number of visits that all Tier III offenders will be compliant with the requirements of Section 9799.25 (a.1)(1) is left completely unaddressed. Thirty-four in-person visits is the absolute best-case scenario for Tier III offenders, not an average. We have no information before this Court that would suggest that a significant number of Tier III offenders will satisfy those requirements. Section 9799.25(a.1)(3) also provides that any conviction for failure to comply with reporting requirements voids "any relief granted under this subsection." 42 Pa.C.S. § 9799.25 (a.1)(3). We can reasonably guess, therefore, that the number of Tier III offenders who will be required to report in person more than thirty-four times will be significantly larger than zero.

Moreover, to take advantage of the reduction in visits, Tier III offenders must substitute telephonic reporting for the other three yearly in-person visits. 42 Pa.C.S. § 9799.25(a.1)(2). But, "[n]o individual may utilize the telephonic verification system until the Pennsylvania State Police publishes notice in the Pennsylvania Bulletin that the system is operational." 42 Pa.C.S. § 9799.25(a.2). The Majority acknowledges but does nothing to resolve Torsilieri's contention that this telephonic reporting system has not yet been instituted despite the clear mandate in Section 9799.25(a.2).[34] 42 Pa.C.S. § 9799.25(a.2) ("The Pennsylvania State Police shall develop a mechanism to permit individuals to utilize the telephonic verification system established in this section."). Thus,

---

[34] "Appellee adds that the telephonic registration and notification option to reduce in-person visits … is currently not operational, despite Subchapter H being enacted over five years ago." Majority Op. at 44-45.

at the present time, it could be the case that no Tier III offenders can utilize telephonic reporting and, thus, that no current Tier III offenders will be subject to the bare minimum of thirty-four in person visits. Consequently, the thirty-four in-person visits figure relied upon by the Majority is pure fantasy that simply does not represent the number of in-person reporting visits that will actually be required of a typical Tier III offender.

## Conclusion

For the reasons set for above, I would conclude that Torsilieri met his high burden of proving that SORNA's irrebuttable presumption is unconstitutional. Additionally, I would find that Subchapter H's registration and reporting requirements for Tier III offenders are punitive and, therefore, unconstitutional under *Apprendi*. Thus, I would affirm the decision of the trial court.